SIGNODE CORPORATION, Plaintiff-Appellant, v. NORMANDALE PROPERTIES, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 87—2506

Opinion filed December 20, 1988.

Robert D. Kolar, Jeanine L. Stevens, and Michele T. Oshman, all of Robert D. Kolar & Associates, Ltd., of Chicago, for appellant.

Francis D. Morrissey, Gary W. Fresen, and Lisa Sopata, all of Baker & McKenzie, of Chicago, for appellees.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff, Signode Corporation (Signode), appeals the dismissal with prejudice of its complaint against defendants Normandale Properties, Inc. (Normandale), and Rauenhorst Corporation (Rauenhorst).

This appeal arises from an insurance subrogation action for property damage involving the collapse of a roof. On March 3, 1978, defendant Normandale entered into a written lease with plaintiff Signode, whereby Normandale, as landlord, agreed to "furnish all of the material and labor and to do all things necessary for the construction of a Warehouse/Office Building ***, at Landlord's sole cost and expense." The landlord also agreed to prepare final plans and specifications in accordance with applicable building and zoning regulations; to appoint a competent and experienced engineer to work with the

tenant in the "design of the Building" so that the same would meet the requirements of the tenant. The tenant agreed to appoint an officer or employee of the tenant to work with the landlord in the "design of the Building." Defendant Normandale is a wholly owned subsidiary of defendant Rauenhorst, both Minnesota corporations. Normandale engaged Rauenhorst as a general contractor to construct the building.

The term of 10 years was to commence upon the date of "substantial completion" of the improvements. The parties agreed that the building was substantially completed on December 5, 1978, and the term began on that date. Approximately one month later, on January 14, 1979, the roof collapsed. Signode was paid by its insurance carrier. Through Signode, the insurance carrier brings this subrogation action to recover the monies paid to Signode. Counsel for the insurance carrier concedes that it stands in the same position as Signode and that if Signode has no basis for recovery, the subrogation claim must fail.

Plaintiff filed its original action on July 25, 1983, against Rauenhorst and Burger Iron Company. Normandale was not joined as a defendant until plaintiff filed its second amended complaint on September 21, 1984. After a series of dismissals and amendments, we reach plaintiff's fourth amended complaint, which is at issue here. Count I alleged breach of express warranties against Normandale; count V alleged breach of contract against Normandale; and count IX alleged negligence against Rauenhorst. On July 6, 1987, all of the counts were dismissed with prejudice. Signode appeals the dismissal of counts I, V and IX.

I .

Counts I and V against Normandale are based upon the interpretation of the lease between Signode and Normandale. The trial court held that reading the lease as a whole leads to the conclusion that the parties intended to shift the risk of loss for damages to the structure to the third-party insurer. It relied on *Cerny-Pickas & Co. v. C.R. Jahn Co.* (1955), 7 Ill. 2d 393, 131 N.E.2d 100. The insurance company, as subrogee, stepped into the shoes of the subrogor, Signode, for purposes of enforcing a right against a third party. (See *William Aupperle & Sons, Inc. v. American Indemnity Co.* (1979), 75 Ill. App. 3d 722, 394 N.E.2d 724; *London & Lancashire Indemnity Co. of America v. Tindall* (1941), 377 Ill. 308, 36 N.E.2d 334.) The rights and obligations of Signode are governed by the provisions of the lease agreement, dated March 3, 1978, between Normandale and Signode.

The tenant was required to carry all of the customary insurance, to include the landlord as an additional insured, and to pay all premiums. In addition, if other insurance became available during the term of the lease for risks not contemplated at the time the lease was executed, the tenant, at its sole cost and expense but for the mutual benefit of landlord and tenant, was required to maintain such other insurance, in such amounts as might from time to time be reasonably required by the landlord. The tenant further agreed that it would not, on its own initiative or pursuant to the request or requirement of any third party, take out separate insurance unless the landlord was included as a named insured with the loss payable to the landlord.

Article XIII, dealing with "Destruction and Restoration," provided:

> "13.1 Tenant covenants and agrees that in case of damage to or destruction of the Building, or the machinery, fixtures and equipment therein contained (exclusive of Tenant's personal property and trade fixtures), by fire or otherwise, Tenant will promptly, at its sole cost and expense, repair, restore and rebuild the same as nearly as possible to the condition that the same were in immediately prior to such damage or destruction ***. If the net amount of insurance proceeds recovered by Landlord is insufficient to restore, repair and rebuild the Building, machinery, fixtures and equipment therein contained (exclusive of Tenant's personal property and trade fixtures) Tenant will deposit with Landlord upon Landlord's request either a cash deposit equal to the reasonable estimate of the amount necessary to restore, repair and rebuild the same, less the amount of such insurance proceeds available (or other security reasonably satisfactory to Landlord). Said deposit shall be made upon written request of Landlord.
>
> 13.2 All insurance monies recovered by Landlord on account of such damage or destruction, less the costs, if any, to Landlord of such recovery, shall be applied by Landlord to the payment of the costs of repairing, restoring and rebuilding (hereinafter in this Article referred to as the 'Work'), and shall be paid out from time to time as the Work progresses upon the written request of Tenant ***."

These provisions manifest an intent to shift the risk of loss to an insurance carrier. In the seminal case of *Cerny-Pickas*, our supreme court enforced an agreement between parties to a lease that shifted the risk of loss for fire damage to the insurance company of the landlord even though the fire was caused by the negligence of the tenant.

The lease provided that the lessor would pay for fire insurance on the building and equipment. The court reasoned that the parties contemplated that the risk of loss by fire should be insured and thereby agreed that the landlord was to pay for the fire insurance out of the rent premiums paid by the tenant. The tenant, accordingly, was not obligated to purchase its own fire insurance policy. The Illinois Supreme Court held that the subrogation action by the lessor's insurance company against the lessee was barred. It stated:

> "From the lease as a whole we conclude that the lessee was not to be liable for loss by fire regardless of the cause of the fire, and that the parties intended that the lessor should look solely to insurance as compensation for damage caused by any kind of fire." *Cerny-Pickas*, 7 Ill. 2d at 398.

■ The facts in the case at bar are even stronger than in *Cerny-Pickas*. Here, the lease requires the tenant to pay for all insurance, taxes, utilities and other expenses. It manifests a clear intention that the lessor is entitled to have the stipulated rent without any impediments. In order to avoid any misunderstanding, an entire article of the lease is devoted to "INTENT OF PARTIES." For purposes of this case, it is sufficient to quote a portion of the article.

> "ARTICLE XI
> *INTENT OF PARTIES*
>
> 11.1 It being the intention and purpose of the respective parties hereto that *this Lease Agreement shall be a 'Net Lease'* and that *all rentals shall be paid to Landlord without diminution, the parties agree that all cost or expense of whatever character or kind,* general or special, ordinary or extraordinary, foreseen or unforeseen, and of every kind and nature whatsoever that may be necessary in or about the operation of the Demised Premises, and all improvements erected thereon, and Tenant's authorized use thereof during the entire term of this Lease Agreement, or any extension thereof, *shall be paid by Tenant, and all provisions of this Lease* Agreement relating to Impositions, charges or other expenses *are to be construed in light of such intention and purpose that this Lease Agreement be a 'Net Lease', and that all rentals shall be paid to Landlord without diminution, reduction or offset."* (Emphasis added.)

We therefore, conclude that the trial court properly dismissed counts I and V.

## II

■ Since plaintiff's action against Normandale is barred by the provisions of the lease, it is not necessary for us to determine the applicability of any statute of limitations.

## III

■ Count IX of plaintiff's fourth amended complaint is against Rauenhorst. It alleges negligent design and manufacture of structural members. The trial court dismissed count IX as barred by the statute of limitations of section 13—214 of the Code of Civil Procedure for construction actions. (Ill. Rev. Stat. 1985, ch. 110, par. 13—214.) Section 13—214 provides in pertinent part:

"(a) Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced within 4 years from the time the person bringing an action, or his or her privity, knew or. should reasonably have known of such act or omission."

Count IX of the fourth amended complaint specifically alleges that defendant Rauenhorst:

"a. Failed to properly design the bar joists and roofing members;

b. Failed to properly manufacture said bar joists and roofing members;

c. Manufactured said bar joists and roofing members contrary to plans and specifications; and

d. Were otherwise negligent in the design and manufacture of the roof joists and roofing members."

In order to avoid the application of section 13—214, plaintiff argues that the *original* construction was completed and that subsequent negligent work caused the collapse of the roof. Therefore, the trial court should have applied the five-year statute of limitations section 13—205. (Ill. Rev. Stat. 1985, ch. 110, par. 13—205.) We disagree.

Plaintiff's fourth amended complaint alleges that plaintiff moved into the building when it was "substantially completed" on December 5, 1978. The work done during the next month, between taking possession and collapse of the roof, was a continuation of the original construction. Failure to properly design or properly manufacture the bar joists and roofing members clearly falls within section 13—214. Merely because plaintiff moved in before the work was complete will not alter the character of defendant's attempts to improve the design

of the roof. Therefore, section 13—214 applies.

■■ The trial court's dismissal of count IX against Rauenhorst is also based on the retroactivity of the statute of limitations of section 13—214. (Ill. Rev. Stat. 1985, ch. 110, par. 13—214.) In its reply brief, Signode concedes that it "does not dispute the retroactivity issue *** as it applies to the contractor Rauenhorst."

In the case at bar, the roof collapsed on January 14, 1979. Plaintiff's original action against Rauenhorst was filed on July 25, 1983. This was more than 4½ years after the collapse of the roof and therefore barred by section 13—214.

Section 13—214 was reenacted by the legislature on September 16, 1981. Plaintiff's complaint was filed on July 25, 1983, more than 22 months after the reenactment of section 13—214. The filing was not within a "reasonable time" after the reenactment. The time period of 22 months is three times as long as plaintiff delayed in *Champaign County Nursing Home v. Petry Roofing, Inc.* (1983), 117 Ill. App. 3d 76, 452 N.E.2d 847, and more than 2½ times as long as plaintiff delayed in *Matayka v. Melia* (1983), 119 Ill. App. 3d 221, 456 N.E.2d 353.

We, therefore, conclude that the trial court properly dismissed count IX.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and EGAN, J., concur.